CARL N. PEHLKE and BARBARA D. PEHLKE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent JAMES A. LUKSCH and MARGARET T. LUKSCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pehlke v. Commissioner
Docket Nos. 8909-76, 8910-76.
United States Tax Court
T.C. Memo 1978-254; 1978 Tax Ct. Memo LEXIS 264; 37 T.C.M. (CCH) 1088; T.C.M. (RIA) 78254; July 10, 1978, Filed J. Michael Frost, for the petitioners. Elsie Hall, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions thereto: Docket No. 8909-76 Petitioners Carl N. Pehlke and Barbara D. Pehlke Tax Year
Additions to Tax, I.R.C. 1954, [1] Ended
Deficiency
Sec. 6651(a)(1)
Sec. 6651(a)(2)
12/31/71
$ 5,381.60
12/31/72
929.55
$ 9.39
$ 171.97
12/31/73
3,963.00
*266 Docket No. 8910-76 Petitioners James A. Luksch and Margaret T. Luksch Tax Year
Additions to Tax, Ended
Deficiency
I.R.C. 1954, Sec. 6651(a)(2)
12/31/71
$ 5,061.60
12/31/72
3,302.39
$ 1,458.75
12/31/73
4,363.68
Both petitioners and respondent have made concessions, leaving the following issues for decision: (1) Whether petitioners sustained any bad debt losses during 1971 in excess of the amounts allowed by respondent; (2) whether any bad debt losses that may have been sustained resulted from nonbusiness debt.s, and (3) whether petitioners James A. Luksch and Margaret T. Luksch are liable for an addition to tax under section 6651(a)(2). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of their petition in this case Carl N. Pehlke and Barbara D. Pehlke, husband and wife, maintained their legal residence in Indianapolis, Indiana. For the taxable years in issue, the Pehlkes filed joint individual income tax returns with the Internal Revenue Service Center in *267 Cincinnati, Ohio, or Memphis, Tennessee. At the time of the filing of their petition in this case James A. Luksch and Margaret T. Luksch, husband and wife, resided in Indianapolis, Indiana. For the taxable years at issue, the Luksches filed their joint individual income tax returns with the Internal Revenue Service Center in Cincinnati, Ohio, or Memphis, Tennessee. Carl N. Pehlke was born in 1927. He is a 1949 graduate of Purdue University, where he majored in industrial engineering and received a Bachelor of Science degree. He subsequently graduated from the University of Chicago with a Master of Business Administration degree. Following his graduation from Purdue, Mr. Pehlke was employed in the Microwave Department of Motorola, Inc. in Chicago. The final position he held at Motorola was Operations Manager of the company's Microwave Department. Between 1961 and 1963 Mr. Pehlke was employed in the telephone division of ITT-Kellogg as Industrial Products Manager. Subsequently he served as the Product Planning Manager of ITT-Kellogg's Military Division. Thereafter he was employed by Telonic Industries, Inc., Beech Grove, Indiana, from 1963 to 1965. Initially he served *268 as Assistant General Manager, and finally, as General Manager. James A. Luksch was born in 1930. He received a Bachelor of Science degree from the State University of New York at Buffalo in 1957, having majored in electrical engineering. In 1960 he received a Master of Science degree from the University of Pennsylvania where his studies were also concentrated in the field of electrical engineering. From 1960 to 1963 Mr. Luksch was employed in the Missile and Surface Radar Division of Radio Corporation of America, where he held various positions, the final one being Senior Systems Engineer. In 1963 Mr. Luksch commenced working for Telonic Industries, Inc. as the Director of Engineering. In 1965, being dissatisfied with their employment at Telonic Industries, five employees [2] including Mr. Pehlke and Mr. Luksch decided to form a business of their own. These five employees met with a Mr. Groshans with regard to the possibilities of starting a business, the activity of which would encompass the design, manufacture and sale of electronic test equipment. Mr. Groshans, a broker in the Indianapolis area, aided the Telonic Industries employees in raising money for their proposed *269 business venture. To that end, the five Telonic Industries' employees and Mr. Groshans decided to form Texscan Corporation (hereinafter Texscan). They arranged for a Small Business Investment Corporation loan of between $ 175,000 and $ 200,000. Texscan was incorporated under the laws of Indiana in May 1965. Mr. Pehlke and Mr. Luksch both purchased as much Texscan stock as they felt they could afford at the time. At trial neither could recall the precise amount of stock purchased at the time of Texscan's formation but estimated that the total amount purchased by the two of them was less than 10 percent of the outstanding stock. Mr. Pehlke and Mr. Luksch served as directors of Texscan from its inception and were still serving as directors at the time of the trial on this case. During this entire period Mr. Pehlke served as president of Texscan and Mr. Luksch served as executive vice president and treasurer. From 1970 to the time of trial, Mr. Luksch also served as secretary of Texscan. Mr. Groshans was a director of Texscan from 1965 through 1969. From May 1963 through December 1967 and from January 1970 through and including the time of trial, Mr. Pehlke and Mr. Luksch were *270 also employees of Texscan, each receiving a salary of a little over $ 22,000 in 1967.
Soon after the formation of Texscan, Telonic Industries filed a civil antitrust action against Messrs. Pehlke, Luksch, and others. Telonic Industries alleged that Mr. Pehlke and Mr. Luksch had misappropriated trade secrets, had wrongfully hired employees away from Telonic Industries and had taken Telonic Industries' customer lists. In December of 1967, I-Tel, Inc., another company engaged in the production of electronic test equipment, filed a similar lawsuit against Texscan. These two lawsuits were matters of general knowledge in the electronic test equipment industry. As a result of these lawsuits, for a period of two or three years Texscan had to pay a royalty to I-Tel, Inc. on all filters Texscan manufactured. In June 1971, Texscan agreed to pay $ 135,000 to Telonic Industries in full settlement of the lawsuit filed against Messrs. Pehlke, Luksch, and others. For the fiscal year ended April 30, 1967, Texscan's net sales totaled $ 996,517. The net income of Texscan for that fiscal year, however, *271 was only $ 2,094. Upon learning this, Mr. Luksch and Mr. Pehlke concluded that Texscan's profit margin was not sufficient to justify their salaries. After meeting with Mr. Groshans, they decided to form another company, VTC, Incorporated (hereinafter VTC), [3] which would manage a number of diversified companies, including Texscan and Versatek Industries (hereinafter VI), and thereby spread over a larger base the general and administrative costs of such companies, including the salaries of Mr. Pehlke and Mr. Luksch. VTC was incorporated under the laws of Indiana on or about October 24, 1967. Mr. Pehlke and Mr. Luksch served both as officers and directors of VTC from its inception until about September 26, 1970. During 1968 and 1969, Texscan was managed under a contract with VTC, which provided management and accounting services for Texscan. During its fiscal years ended April 30, 1969, and April 30, 1970, Texscan paid fees of $ 56,900 and $ 85,323, respectively, to VTC under this contract. From the time of VTC's formation in October 1967 until the end of that calendar year, Mr. Pehlke and Mr. Luksch were paid no salary *272 by VTC. During the calendar year 1968 Mr. Pehlke and Mr. Luksch were substantially full-time employees of VTC. Each received a salary of $ 25,192.34. During the same year, each was paid remuneration of $ 473.16 by Texscan. During the calendar year 1969 Mr. Pehlke and Mr. Luksch were again substantially full-time employees of VTC, and in that year each received a salary of $ 26,538.51 from VTC. During the same year Mr. Pehlke and Mr. Luksch each received remuneration of $ 120 from Texscan. After December 31, 1969, Mr. Pehlke and Mr. Luksch received no further salary payments from VTC. In January 1970 VTC's management contract with Texscan was terminated, and VTC ceased operations. On or about January 1, 1970, Mr. Pehlke and Mr. Luksch again became substantially full-time employees of Texscan, each receiving a salary of $ 31,461.79 from Texscan for the year 1970. On or about October 24, 1967, when VTC was first being organized, Mr. and Mrs. Pehlke contributed the following money and other property to VTC in exchange for 50,000 shares of VTC common stock: (1) $ 1,126.67 in cash. (2) 2,000 shares of Texscan common stock. The Pehlkes' basis in this stock was $ 4,140. *273 (3) 100 shares of TEMCO (Texscan Electronic Manufacturing Company, Inc.) stock. TEMCO was a corporation formed by petitioners and others to produce inexpensive stereo equipment. TEMCO went through Chapter 11 and final bankruptcy in September 1969. The Pehlkes' basis in the TEMCO stock was zero. (4) 18,000 shares of common stock issued by Limited (Texscan Limited, Inc.). Limited was a company organized by petitioners and others to market Texscan products overseas. The Pehlkes' basis in the Limited stock was $ 6,000. The Pehlke's total basis in the money and stock contributed by them in exchange for VTC stock was $ 11,266.67. Mr. and Mrs. Pehlke never acquired any additional VTC common stock. They disposed of only 253 shares of the VTC common stock they received, 250 shares on or about April 9, 1968, and 3 shares on or about January 10, 1969. When VTC was organized the Luksches also contributed money and property in exchange for 50,000 shares of VTC common stock. On or about October 24, 1967, Mr. Luksch contributed $ 1,126.67 in cash, 2,000 shares of Texscan common stock, 100 shares of TEMCO common stock, and 18,000 shares of Limited common stock to VTC. The Luksches' *274 total basis in the money and other property contributed to VTC for common stock was $ 11,266.67. The Luksches never acquired any more VTC stock and never disposed of any of the VTC common stock which they held. On August 26, 1968, VTC obtained a working capital loan in the principal amount of $ 240,000 from Anthony Wayne Bank of Ft. Wayne, Indiana. As a condition to making the loan, the bank required that petitioners and Mr. and Mrs. Groshans, as co-makers, execute a promissory note evidencing the loan. The lending bank also required that the loan to VTC be secured by the following collateral, some of which was pledged with the bank at the time the loan was made, and some of which was pledged with the bank from time to time thereafter: (1) 5,000 shares of common stock of Bio-Dynamics, Inc. owned by Willard D. Eason, a friend of Mr. Pehlke and Mr. Luksch. (2) 12,600 shares of Texscan common stock owned by VI; (3) A $ 68,000 non-interest-bearing certificate of deposit issued by the bank to VI; (4) 31,500 shares of Texscan common stock owned by VTC; (5) 6,000 shares of Texscan common stock owned by Mr. Pehlke; (6) 6,000 shares of Texscan common stock owned by Mr. Luksch; *275 and (7) The rights of VTC under an "earnout" agreement dated February 25, 1970, between VTC and Texscan. Mr. Pehlke and Mr. Luksch induced Mr. Eason to pledge his 5,000 shares of common stock of Bio-Dynamics, Inc. to the Anthony Wayne Bank as security for the loan by entering into written agreements with Mr. Eason pursuant to which Mr. Pehlke and Mr. Luksch each pledged with Mr. Eason 12,500 shares of their Texscan common stock. On or about October 23, 1968, the principal amount of the loan was increased to $ 340,000. As a result of repayments between April 21, 1969, and June 9, 1970, the principal amount of the loan was reduced to $ 312,000. On or about June 19, 1970, Anthony Wayne Bank released the 12,600 shares of Texscan common stock owned by VI and pleged as collateral for the loan to VTC. Throughout the period from about June 10, 1970, to about August 10, 1970, the principal amount of the loan was $ 267,000. On or about August 10, 1970, VTC defaulted on the loan from Anthony Wayne Bank. On or about August 11, 1970, Anthony Wayne Bank applied toward reduction of the principal amount of the loan VI's $ 68,000 certificate of deposit which had been pledged as collateral, *276 thereby reducing the principal amount of the loan to $ 199,000. Thereafter Mr. Eason entered into negotiations with the bank concerning the release of the collateral pledged as security for the VTC loan, so that the bank would not foreclose on the 5,000 shares of Bio-Dynamics, Inc. common stock pledged by Mr. Eason as collateral. On November 20, 1970, Mr. Eason entered into an agreement with the Anthony Wayne Bank whereby he paid the bank $ 130,000 and the bank transferred the VTC note co-signed by the Pehlkes and the Luksches to him. The bank also released to Mr. Eason the existing collateral for the loan, which at that time consisted of 5,000 shares of Bio-Dynamics, Inc. common stock pledged by Mr. Eason, 31,500 shares of Texscan stock owned by VTC, 6,000 shares of Texscan stock owned by Mr. Pehlke, 6,000 shares of Texscan stock owned by Mr. Luksch, and the rights of VTC under the "earnout" agreement between VTC and Texscan. In addition, the bank released its claims against VTC, the Pehlkes and the Luksches. When VTC defaulted on its payment on the note to the Anthony Wayne Bank, Mr. Pehlke and Mr. Luksch were not financially able to pay the note. They discussed with Mr. *277 Eason his purchase of the note and prior to Mr. Eason's negotiations with the bank for release of the collateral in exchange for the $ 130,000 payment, Mr. Pehlke and Mr. Luksch had orally agreed with Mr. Eason to reimburse him for his payment to the bank. In exchange, Mr. Pehlke and Mr. Luksch were to receive the 25,000 shares held by Mr. Eason as collateral for his Bio-Dynamics, Inc. shares [4] together with all the collateral surrendered by the bank to Mr. Eason except Mr. Eason's 5,000 shares of Bio-Dynamics, Inc. stock. On February 19, 1971, Mr. Pehlke, Mr. Luksch and Mr. Eason executed an agreement which provided in part: The Seller [Mr. Eason] on November 20, 1970 purchased a certain note which has been in default since August 10, 1970, the existing balance thereon in the amount of $ 199,000.00 excluding interest, together with all of its collateral which included 43,500 shares of Texscan Corporation stock *278 as well as an Agreement between Texscan Corporation and VTC, Inc. dated February 25, 1970. Since the purchase of the note and the collateral, the Seller has attempted to sell the note and/or the collateral. The Buyers [Mr. Pehlke and Mr. Luksch] are co-makers of the note and desire to purchase the collateral and be released from all of their obligations to the Seller as co-makers of the note. Both the Buyers and the Seller are aware of the status of the shares posted as collateral and do not intend that any distribution of the shares be made to the public without complying with the Securities Act of 1933 or the General Rules and Regulations promulgated under said Act and the Securities Laws of any pertinent jurisdiction in which the shares might be sold. In consideration of the promises recited in this instrument, the parties agree that on or before February 20, 1971 the Buyers shall purchase all of the shares of Texscan Corporation common stock heretofore posted as collateral including all of the Seller's interest in the Agreement between Texscan and VTC, Inc. dated February 27, 1970 in the manner described therein evidenced by an assignment in the form attached and marked *279 Appendix I for $ 130,000.00. Upon payment of $ 43,334.00 in cash on or before February 20, 1971, the Buyers shall receive 14,500 Texscan common shares from the Seller as agent for the registered owner of the shares and as the pledgee thereof. The Seller shall loan to the Buyers $ 86,666.00 to cover the balance of the purchase price and the Buyers shall execute two notes in the form attached as Appendix II, each in the amount of $ 43,333.00, the first note to be due on February 20, 1972, the second note to be due on February 20, 1973, the Buyers pledging as collateral approximately 14,500 shares of Texscan stock on each note thereto received by them. Upon payment of each note in full, the Buyers shall repossess the shares posted as collateral on each note. Upon execution of the two notes, the Seller, as holder, shall release forever all of the obligations of the Buyers as comakers of a certain note dated June 10, 1970 due August 10, 1970, in the face amount of $ 267,000.00 in the principal amount of $ 199,000.00 and executed by Versatek Texscan Corporation as well as all of the Buyers. The Buyers agree that all of the shares purchased are taken for investment and not with a *280 view to distribute the shares to the public and that any subsequent sale shall be made only if the Buyers comply with the Securities Act of 1933 and the General Rules and Regulations promulgated thereunder. During 1971 Mr. Pehlke and Mr. Luksch each made payments to Mr. Eason of $ 21,667 of principal and $ 2,599.86 of interest. In that year Mr. Eason released to Mr. Pehlke the 6,000 shares of Texscan common stock owned by Mr. Pehlke and pledged with Anthony Wayne Bank as collateral for the loan to VTC and released to Mr. Pehlke 1,250 of the 31,500 shares of Texscan common stock which VTC had pledged with Anthony Wayne Bank as collaterial for VTC's loan. Also, in 1971 Mr. Eason released to Mr. Luksch the 6,000 shares of Texscan common stock owned by Mr. Luksch and pledged by him with Anthony Wayne Bank as collateral for the loan to VTC, and 1,250 of the 31,500 shares of Texscan common stock pledged by VTC with Anthony Wayne Bank as collateral for the loan to VTC. In addition, on or about February 20, 1971, Mr. Eason assigned to Mr. Pehlke and Mr. Luksch the rights of VTC under the "earnout" agreement that VTC had earlier pledged as collateral for the loan to VTC. On or about *281 July 16, 1971, Mr. Pehlke and Mr. Luksch executed a waiver, pursuant to which all of any remaining contingent liability of Texscan under the "earnout" agreement was canceled in consideration of Texscan's cancellation of a demand promissory note dated December 23, 1970, from Mr. Pehlke to Texscan in the principal amount of $ 8,742.36, bearing interest at 4 percent, and a promissory note from Mr. Luksch to Texscan of the same date and in the same amount. These notes had been given to Texscan by Mr. Pehlke and Mr. Luksch for the purchase of 5,907 shares each of Texscan stock by exercise of stock options for the stock under an option price of $ 1.48 per share. In 1972 Mr. Pehlke made payments of principal to Mr. Eason in the amount of $ 21,666.50 and interest of $ 2,044.72. In 1972 Mr. Luksch made payments to Mr. Eason of principal in the amount of $ 21,666.50 and interest of $ 2,044.73. On or about January 17, 1972, Mr. Pehlke received from Mr. Eason 6,000 more of the 31,500 shares of Texscan common stock which VTC had originally pledged to Anthony Wayne Bank as collateral for the VTC loan and which the bank had released to Mr. Eason pursuant to its agreement with him. Mr. Luksch *282 also received 6,000 shares of such Texscan common stock. On or about July 7, 1972, Mr. Pehlke and Mr. Luksch each received from Mr. Eason an additional 1,250 shares of the 31,500 shares of Texscan stock. In 1973 Mr. Pehlke and Mr. Luksch each made payments of principal to Mr. Eason totaling $ 21,666.50 and payments of interest of $ 1,055.76. As of June 29, 1973, Mr. Pehlke and Mr. Luksch had each paid Mr. Eason the full amount of the principal payments due him under the agreement executed on February 19, 1971. Consequently, on June 29, 1973, Mr. Eason released to Mr. Pehlke 7,250 shares and to Mr. Luksch 7,250 shares of the Texscan stock which he had acquired from Anthony Wayne Bank. This 14,500 shares of Texscan stock was the remaining balance of the stock Mr. Eason had received from the bank pursuant to his agreement with the bank of November 20, 1970. On or about March 5, 1969, the Pehlkes obtained a loan of $ 26,000 from the Merchants National Bank and Trust Company of Indianapolis, Indianapolis, Indiana (hereinafter Merchants National Bank and Trust). The full amount of this loan was reduced by interest of $ 503.75, leaving net proceeds of the loan of $ 25,496.25. On *283 or about March 6, 1969, Mr. Pehlke loaned to VTC the net proceeds of this loan. At that time Mr. Pehlke and Mr. Luksch agreed that if VTC failed to repay all or any part of this loan which Mr. Pehlke had made to VTC, Mr. Luksch would pay Mr. Pehlke 50 percent of the installments of principal and interest which thereafter became due on the loan from Merchants National Bank and Trust and Mr. Pehlke assigned to Mr. Luksch a 50-percent interest in the $ 25,496.25 loan which he had made to VTC. VTC never made any cash payments to Mr. Pehlke on account of the loan he had made to VTC. On or about June 29, 1970, however, VTC transferred to Mr. Pehlke 8,237 shares of Texscan common stock which had been owned by VTC. On the same date VTC's general ledger account No. 202, relating to VTC's notes payable to Mr. Pehlke, was debited in the amount of $ 28,328.10; VTC's general ledger account No. 115, relating to VTC's investments, was credited in the amount of $ 26,465.48; and VTC's general ledger account No. 325, relating to VTC's losses on investments, was credited in the amount of $ 1,862.62. Mr. Pehlke transferred to Mr. Luksch 3,828 of the 8,237 shares of Texscan common stock that VTC *284 had transferred to him in return for the agreement Mr. Luksch had made to pay to Mr. Pehlke 50 percent of the installment payments on the Pehlkes' note to the Merchants National Bank and Trust. Mr. Pehlke made the following payments to Merchants National Bank and Trust on account of the loan to the Pehlkes: (a) On June 5, 1969, a payment of interest in the amount of $ 509.35. (b) On August 29, 1969, a payment of interest in the amount of $ 520. (c) On November 28, 1969, a payment of interest in the amount of $ 525.80. (d) On March 2, 1970, a payment of interest in the amount of $ 531.56. (e) On June 4, 1970, a payment of principal in the amount of $ 2,000 and a payment of interest in the amount of $ 480. (f) On August 31, 1970, a payment of principal in the amount of $ 1,000 and a payment of interest in the amount of $ 500. (g) On December 7, 1970, a payment of principal in the amount of $ 2,550 and a payment of interest in the amount of $ 450. (h) On March 18, 1971, a payment of principal in the amount of$ 600 and a payment of interest in the amount of $ 397. (i) On June 18, 1971, a payment of principal in the amount of $ 1,631 and a payment of interest *285 in the amount of $ 369. (j) On September 17, 1971, a payment of interest in the amount of $ 368.44. (k) On December 14, 1971, a payment of interest in the amount of $ 227.75. (l) On January 17, 1972, a payment of principal in the amount of $ 18,219. On the same date he received a rebate of interest in the amount of $ 94.89. Pursuant to his agreement with Mr. Pehlke with regard to the repayments of the loan from Merchants National Bank and Trust, Mr. Luksch made the following payments to Mr. Pehlke: (a) On August 31, 1970, a payment of principal in the amount of $ 500 and a payment of interest in the amount of $ 250. (b) On December 4, 1970, a payment of principal in the amount of $ 1,275 and a payment of interest in the amount of $ 225. (c) On March 13, 1971, a payment of principal in the amount of$ 300 and a payment of interest in the amount of $ 198.50. (d) On June 18, 1971, a payment of principal in the amount of $ 815.50 and a payment of interest in the amount of $ 184.50. (e) On September 17, 1971, a payment of interest in the amount of $ 184.22. (f) On December 14, 1971, a payment of interest in the amount of $ 113.88. (g) On December 16, 1971, a *286 payment of principal in the amount of $ 9,109.50. On that date Mr. Luksch received a rebate of interest in the amount of $ 47.45. On or about May 15, 1969, Mr. Pehlke obtained a loan from Peoples Bank and Trust Company, Indianapolis, Indiana, in the principal amount of $ 5,028.60. He then loaned to VTC $ 5,000 of the net proceeds of this loan. Mr. Pehlke agreed to repay the loan in 29 monthly installments of $ 167.62, commencing on June 28, 1969, and ending on November 28, 1972. Between June 30, 1969, and July 27, 1970, Mr. Pehlke made 13 monthly payments of principal and interest in the amount of $ 167.62 and one payment in the amount of $ 264.46. On August 31, 1970, he made a final payment of principal and interest in the amount of $ 2,551.18. Between September 29, 1969, and June 29, 1970, VTC made 10 regular monthly payments to Mr. Pehlke on account of the $ 5,000 loan from Mr. Pehlke. These payments consisted of principal payments only. The monthly installments were $ 166.67. On or about July 19, 1968, Mr. Pehlke and Mr. Luksch each loaned $ 11,930 to VTC.Receipt of this loan is reflected in VTC's cash receipts journal. These loans are reflected as credits in the *287 portion of VTC's general ledger concerning VTC's general ledger account No. 202 for the fiscal years ended April 30, 1969, and April 30, 1970, relating to VTC's notes payable to Mr. Pehlke and Mr. Luksch. On July 19, 1968, both the Pehlkes and the Luksches sold 1,000 shares of Texscan stock, on which sales each petitioner recognized a gain of $ 11,930. In August 1968 Mr. Pehlke and Mr. Luksch each loaned another $ 11,930 to VTC. Receipt of these loans is reflected in VTC's cash receipts journal as a credit in the portion of VTC's general ledger concerning VTC's general ledger account No. 202, for the fiscal years ended April 30, 1969, and April 30, 1970, relating to VTC's notes payable to Mr. Pehlke and Mr. Luksch.On August 1, 1968, both the Pehlkes and the Luksches had sold another block of 1,000 shares of Texscan stock, on which they realized a gain of $ 11,930. VTC's cash receipts journal reflects, under date of August 27, 1968, cash received from Mr. Pehlke in the amount of $ 55,962.40 and cash received from Mr. Luksch in the same amount. These figures are reflected as credits in the portion of VTC's general ledger concerning VTC's general ledger account No. 202 for the *288 fiscal years ended April 30, 1969, and April 30, 1970, relating to VTC's notes payable to Mr. Pehlke and Mr. Luksch. The following amounts are reflected as credits in VTC's cash receipts journal and the portion of VTC's general ledger concerning VTC's general ledger account No. 202 for the fiscal years ended April 30, 1969, and April 30, 1970, relating to VTC's notes payable to Mr. Pehlke: Date
Amount of Entry
August 27, 1968
$ 55,962.40
February 4, 1969
8,333.34
March 13, 1969
1,766.93
Mr. Pehlke could not recall the specific sources of funds for these credit entries. The following amounts are also reflected as credits in VTC's cash receipts journal and the portion of VTC's general ledger concerning VTC's general ledger account No. 202 for the fiscal years ended April 30, 1969, and April 30, 1970, relating to VTC's notes payable to Mr. Luksch: Date
Amount of Entry
August 27, 1968
$ 55,962.40
February 4, 1969
8,333.33
March 13, 1969
1,766.93 Mr. Luksch could not recall the specific sources of funds for these credit entries. A number of erroneous credit entries were made to the VTC notes payable accounts of Mr. Pehlke and Mr. *289 Luksch.Among the erroneous credit entries made to the VTC notes payable account for Mr. Pehlke were the following: Date of Entry
Amount of Entry
October 1968
$ 33,333.34
December 1968
8,333.34
October 1969
78,799.00
$ 120,465.68 Among the erroneous credit entries made to the VTC notes payable account for Mr. Luksch were the following: Date of Entry
Amount of Entry
October 1968
$ 33,333.33
December 1968
8,333.33
October 1969
78,799.00
$ 120,465.66
The erroneous credit entries to the VTC notes payable account for Mr. Pehlke are offset by the following debit entries to that account: Date of Entry
Amount of Entry
January 1969
$ 8,333.34
April 1970
74,950.00
June 1970
81,050.00
$ 164,333.34 Similarly, the erroneous credit entries to the VTC notes payable account for Mr. Luksch are offset by the following debit entries to that account: Date of Entry
Amount of Entry
January 1969
$ 8,333.33
April 1970
74,950.00
June 1970
81,050.00
$ 164,333.33
The VTC notes payable account for Mr. Pehlke shows a credit entry in the amount of $ 2,137 for June 1970. The VTC notes payable account for *290 Mr. Luksch also reflects a credit entry in the same amount for June 1970.These entries reflect accrued interest. This interest was never reported as income by either the Pehlkes or the Luksches on their Federal income tax returns. VTC made payments to Mr. Pehlke in reduction of its indebtedness to him. The amounts of these payments as reflected by debits on VTC's general ledger account No. 202 for the fiscal years ended April 30, 1969, and April 30, 1970, relating to VTC's notes payable to Mr. Pehlke are as follows: Date
Amount of Debit
April 1969
$ 3,333.34
April 1969
666.67
June 1969
150.00
July 1969
1,650.00
August 1969
200.01
September 1969
7,500.00
October 1969
2,500.00
November 1969
3,000.00
$ 24,000.02 In October 1969, in connection with a spin-off, a credit in the amount of $ 350 was made to the notes payable account for Mr. Pehlke. VTC made payments to Mr. Luksch in reduction of its indebtedness to him. The amounts of these payments as reflected by debits on VTC's general ledger account No. 202 for the fiscal years ended April 30, 1969, and April 30, 1970, relating to VTC's notes payable to Mr. Luksch are as follows: Date
Amount of Debit
April 1969
$ 8,333.33
April 1969
666.67
July 1969
1,500.00
September 1969
7,500.00
October 1969
2,500.00
November 1969
3,000.00
$ 23,500.00
*291 In October 1969, in connection with a spin-off, a credit in the amount of $ 350 was made to the notes payable account for Mr. Luksch. As of June 1970 VTC's notes payable account for Mr. Pehlke reflected a credit balance in the amount of $ 25,041.99, including $ 2,137 in accrued interest. On or about July 1, 1970, VTC executed and delivered to Mr. Pehlke a promissory note in the amount of $ 25,041.99. As of June 1970, VTC's notes payable account for Mr. Luksch also reflected a credit balance in the amount of $ 25,041.99, including $ 2,137 in accrued interest. On or about July 1, 1970, VTC executed and delivered to Mr. Luksch a promissory note in the amount of $ 25,041.99. On the following dates the total number of issued and outstanding shares of Texscan common stock were as follows: No. of Shares Date
Outstanding
June 29, 1970
512,597
February 19, 1971
533,816
February 20, 1971
533,816
January 17, 1972
646,908
July 7, 1972
685,408
June 29, 1973
783,053
During the following months the total number of shares of Texscan common stock which were transferred of record as a result of sales were as follows: No. of Shares Date
Outstanding
June 1970
7,661
February 1971
14,373
January 1971
44,953
July 1972
4,275
June 1973
4,449
*292 On the following dates, the bid and asked prices per share of freely transferrable Texscan common stock in the over-the-counter market were as follows: Date
Bid Price
Asked Price
June 29, 1970
$ 3-1/2
$ 3-7/8
February 19, 1971
4-1/4
4-1/2
February 20, 1971
4-1/4
4-1/2
January 17, 1972
6-1/4
6-1/2
July 7, 1972
4-1/2
5
June 29, 1973
2-3/8
2-7/8
In connection with an offering of 8-1/2 percent convertible subordinated debentures due December 1, 1981, and 20,000 shares of common stock, Texscan issued a prospectus to which were attached financial statements of the company for the five fiscal years ended April 30, 1971, and the six-month period ended October 31, 1971. The financial statements contained in this prospectus are consolidated statements of Texscan and its subsidiaries and show the following income (loss) from continuing operation before extraordinary items for the years indicated: Fiscal Year Ended April 30
Income (Loss)
1967
$ 94
1968
63,204
1969
99,791
1970
80,234
1971
26,641 These figures were then reduced by losses from discontinued operations less tax benefits for the year 1971 in the amount of $ 142,148 *293 and were increased by income (loss) for extraordinary items for each of the years resulting in net income or loss for the years indicated in the following amounts: Fiscal Year Ended April 30
Net Income (Loss)
1967
$ 2,094
1968
111,404
1969
197,791
1970
80,234
1971
(133,328) The financial data for the fiscal years 1967 through 1971 were certified by Lybrand, Ross Bros. and Montgomery. The report also contained unaudited figures for the period ended October 31, 1971, which show for that period income from continuing operations before extraordinary items of $ 57,657, extraordinary items of $ 27,000, and net income of $ 84,657. In this prospectus the following appears under the title "Management": Directors and Officers. The Directors and Officers of the Company are as follows: Name Office
Carl N. Pehlke
President and Director
James A. Luksch
Executive Vice President,
Treasurer and Secretary, and Director
Daniel F. Litterski
Vice President--Manufacturing
Robert J. Shevlot
Vice President--Marketing
Gregory D. Buckley
Assistant Secretary and Director
Each of the individuals named above has served the Company for more *294 than five years in an executive capacity except for Gregory D. Buckley, who was elected Director and Assistant Secretary of the Company in 1970. Mr. Buckley is a member of the law firm of Buckley & Frost, Indianapolis, Indiana, general counsel for the Company.
The prospectus shows that during the fiscal year 1971 Mr. Pehlke and Mr. Luksch were each being compensated at the rate of $ 35,000 per year. This prospectus also contained the following statement: As approved by the Board of Directors of the Company on December 15, 1971, Messrs. Pehlke and Luksch each agreed to cancel their options granted to them, pursuant to the 1968 loan, to purchase a total of 49,850 shares of common stock in consideration for the payment of $ 6,231.25 to each and the adoption of the Executive Bonus Plan (See "Management--Remuneration"). In addition, under stock subscription agreements dated January 8, 1971, Messrs. Pehlke and Luksch subscribed for 10,000 shares each and Gregory D. Buckley subscribed for 5,000 shares of the Company's common stock at the then current market value of $ 3.00 per share. The agreements provide for payment at any time within three years from their date, with the unpaid *295 balance of the purchase price bearing interest at the rate of four per cent per annum. * * *
The prospectus also shows that as of December 27, 1971, Mr. Pehlke owned 39,677 shares or 6.2 percent and Mr. Luksch owned 42,013 shares or 6.6 percent of the stock of Texscan. It also shows that 10,000 shares were being sold by each Mr. Pehlke and Mr. Luksch to the underwriter indicating that Mr. Pehlke would own 29,677 shares and Mr. Luksch 32,013 shares after the sale. The statement showed that the number of shares owned by Mr. Pehlke excluded 11,457 shares owned by his wife individually and 984 shares owned by her as custodian for their three children, and excluded 3,405 shares owned by the wife of Mr. Luksch. It also showed that the statement of shares excluded 10,000 shares for each Mr. Pehlke and Mr. Luksch which had been subscribed for under stock subscription agreements. The prospectus contained the following statement: Carl N. Pehlke and James A. Luksch may be deemed to be "parents" of the Company within the meaning of the Securities Act of 1933. The prospectus also contained the following statement: On July 14, 1971, the Company settled an obligation of $ 25,142 for *296 legal services rendered, due and owing to a law firm of which Gregory D. Buckley was a member. As his part of the settlement and in lieu of the cash payment of $ 12,571, Mr. Buckley was issued 4,200 shares of the Company's common stock. The last recitation in the prospectus was in respect to "Registration Statement." This statement said that the company had filed with the Securities and Exchange Commission in Washington, D.C. a registration statement under the Securities Act of 1933, as amended, for the registration of the securities being offered in the prospectus. On their Federal income tax return for 1971 the Pehlkes claimed deductions totaling $ 57,647 for business bad debt losses incurred in connection with the Eason agreement, the Merchants National Bank and Trust loan, the Peoples Bank and Trust loan and the VTC notes payable account. On their 1971 return the Luksches claimed business bad debt deductions with respect to these same transactions totaling $ 56,808. These claimed deductions were comprised of the following amounts: [5]
Pehlke
Luksch
Eason Agreement
$ 26,259
$ 26,258
Payments on Merchants
and Peoples Loans
6,346
5,508
VTC Notes Payable
Accounts
25,042
25,042
Totals
$ 57,647
$ 56,808
*297 Respondent disallowed all of the losses set forth above claimed by the Pehlkes and the Luksches on their 1971 respective tax returns except the allowance of a short-term capital loss of $ 1,937 to the Pehlkes and a short-term capital loss of $ 1,680 to the Luksches. Respondent explained his disallowance of the losses claimed by the Pehlkes as follows: It is determined that the deductions which you claimed in the amounts of $ 25,042.00, $ 6,346.00 and $ 26,259.00 as losses in 1971 for loans or payments made to or on behalf of Versatec Texscan Corporation, are not allowable except for $ 1,000 as short-term capital loss in 1971 and $ 937.00 in 1972 because it has not been established that these losses were incurred by you or that, to the extent of any loss shown in this connection, the amount thereof was deductible as other than a non-business bad debt, to be treated as a *298 short-term capital loss. Accordingly, your taxable income for 1971 is increased $ 57,647.00. (See Schedule #2 for computation.) The exact same explanation was given in the notice of deficiency issued to the Luksches except that the amount of the loss claimed by the Luksches on the Merchants loan was slightly less than that claimed by the Pehlkes on the Merchants and Peoples loans and the short-term capital loss allowed by respondent with respect to this loss was less than that allowed the Pehlkes. In Schedule 2 of the deficiency notice to the Pehlkes respondent computed the short-term capital loss allowed as follows: Amount paid Merchants & Peoples
$ 15,164.00
Received 4,409 shares of Texscan
at $ 3 per share =
13,227.00
Short-term capital loss
$ 1,937.00
Schedule 2 appearing in the deficiency notice to the Luksches showed the following: Amount paid Merchants
$ 13,164.00
Received 3,828 shares of Texscan
at $ 3 per share =
11,484.00
Short-term capital loss
$ 1,680.00
Amount deductible in 1971
1,000.00
Carryover to 1972
$ 680.00
Petitioner James A. Luksch employed Coopers and Lybrand to prepare his and his wife's joint Federal *299 income tax return for 1972. Coopers and Lybrand had prepared returns for the Luksches for prior years. Coopers and Lybrand sends a form to its clients in January requesting the pertinent information necessary for the preparation of the client's tax return for the preceding year. Mr. Luksch received such a form in early 1973 and within a few weeks thereafter supplied the information requested by Coopers and Lybrand. The Luksches gave a power of attorney to their accountant, Charles R. Meyer, a member of the firm of Coopers and Lybrand, authorizing him to request an extension of time within which to file their 1972 tax return. Mr. Meyer, on behalf of the Luksches, filed a Form 4868, "Application for Automatic Extension of Time to File U.S. Individual Income Tax Return," on April 11, 1973. The extension expired on June 15, 1973. The 1972 income tax return prepared by Coopers and Lybrand for the Luksches was mailed to them on June 21, 1973, and signed by them on June 24, 1973, and mailed to the Memphis Service Center of the Internal Revenue Service where it was received on June 29, 1973. The return filed by the Luksches for 1972 showed no tax due but a refund of tax due to the *300 Luksches. In his notice of deficiency to the Luksches respondent determined that for 1972 they were liable for an addition to tax under section 6651(a) (2), giving the following explanation: Since your income tax return for 1972 was not filed, or the amount of tax due paid, within the time prescribed by law and you have not shown that such failure to timely file your return was due to reasonable cause, additions to tax have been applied on the deficiency in tax, computed as provided by sections 6651(a). The parties stipulated with respect to respondent's determination of addition to tax under section 6651(a) (2) as follows: The addition to tax for the calendar year 1972 under Code Sec. 6651(a) (2) which was set forth in the notice of deficiency, a copy of which is Exhibit 16-P hereto, was $ 1,458.75 but was incorrectly computed. Respondent contends that the correct net Code Sec. 6651(a) (2) addition to tax should have been $ 597.36. The Luksches do not contest the accuracy of the arithmetic involved in the computation of such revised net Code Sec. 6651(a) (2) addition to tax, but do contend that there should be no imposition of such addition, because they assert that their *301 failure to file the required return on or before the date prescribed therefor or to pay the required amount of tax on or before the date prescribed therefor was due to reasonable cause and not to willful neglect. * * * OPINION The issues involved in the instant case are all factual. As both parties recognize, section 166(a) (1) allows as a deduction any debt which becomes wholly worthless during the taxable year, but section 166(d) (1) provides that in the case of an individual taxpayer the loss resulting from the wrothlessness of a nonbusiness bad debt is treated as a short-term capital loss. Petitioners take the position that except for the $ 2,137 of interest which each of them concedes was included in the note in the amount of $ 25,041.99 which each received on or about July 1, 1970, from VTC, the losses claimed by them in 1971 have been shown to be accurate and allowable as business losses. In fact, petitioners argue that the losses claimed with respect to the VTC notes payable account by Mr. Pehlke and Mr. Luksch were understated. On brief petitioners do argue that the loss in connection with the Eason payout agreement should be spread over the three years 1971, 1972 *302 and 1973. Respondent contends that petitioners had no bad debt losses in connection with the Eason agreement but that this agreement provided for the purchase by Messrs. Pehlke and Luksch of assets from Mr. Eason. Respondent argues that his computations of the losses of Mr. Pehlke and Mr. Luksch from payments on the Merchants and Peoples loans allow larger amounts than are properly allowable, and that petitioners have totally failed to show any losses with respect to the advances made by them to VTC which were listed in the VTC notes payable account. In this connection respondent argues that the note received by Mr. Pehlke and that received by Mr. Luksch from VTC on or about July 1, 1970, were worthless when they were received. Petitioners argue that all the losses they claimed for advances they made to VTC and from their becoming accommodation co-makers of VTC's note at the Anthony Wayne Bank were business losses because their dominant motivation in making the advances and co-signing the notes was to keep their salaried positions with VTC. We will discuss the amount, if any, of the losses sustained by petitioners on each of the three transactions separately and then deal with *303 the issue of whether these losses, if any, were business bad debts or nonbusiness bad debts. 1. Agreement between Mr. Eason and Messrs. Pehlke and Luksch of February 19, 1971.
We have recited in some detail the facts leading up to Mr. Eason's purchase of the VTC note from the Anthony Wayne Bank and the assignment to him at that time of the collateral securing that note. From these facts we consider it clear that Mr. Eason received for the $ 130,000 he paid to the Anthony Wayne Bank the VTC note and that the collateral securing this note was transferred to him by the bank solely as collateral securing the note he purchased. We likewise consider it clear, and have in our findings so found, that the bank merely waived any right it had to proceed on collection of any portion of the note against VTC, the Pehlkes or the Luksches.In our view the voluminous facts in this record do not support respondent's contention that Mr. Eason purchased the collateral held by the Anthony Wayne Bank. We conclude that the record shows that this collateral was transferred to him as security for the note he purchased. Therefore, in our view, after his transaction with the bank Mr. Eason was the *304 owner of the VTC note and had whatever rights the bank would have had to foreclose on the collateral securing that note and to proceed against VTC as well as the Pehlkes and the Luksches as co-makers of the note. With these facts in mind, we consider the agreement between Mr. Eason and Messrs. Pehlke and Luksch to clearly be an agreement of Mr. Pehlke and Mr. Luksch to pay Mr. Eason on the note the $ 130,000 he had paid to the Anthony Wayne Bank because of their liability as co-makers of the note. We agree with respondent that Mr. Pehlke and Mr. Luksch were undoubtedly anxious to have returned to them the collateral they had pledged with Mr. Eason to induce him to post his Bio-Dynamics, Inc. stock as security for the VTC note, to regain the collateral they themselves had pledged to the bank as security for that note, and to obtain the other assets securing the VTC note. However, in our view this fact does not change the nature of the agreement. The agreement itself recites that Mr. Pehlke and Mr. Luksch are co-makers of the note and desire to be released from their obligation to Mr. Eason as co-makers of the note, as well as reciting their desire to obtain the collateral securing *305 the note. We therefore conclude that petitioners sustained a loss from the transaction with Mr. Eason to the extent that the value of the collateral they obtained, other than that which they had posted to secure the VTC note, did not equal their payment to Mr. Eason. Since respondent does not contend that petitioners had any possibility of collecting this excess, if any, from VTC when they made the payment, we conclude the loss, if any, they sustained was at the time the payment was made. While at no point until briefs in this case were filed did either party contend that Mr. Eason had not been paid on the note in full at the time of the February 19, 1971, agreement and was holding the collateral which he did not release to secure a note given to him personally at that time by Mr. Pehlke and Mr. Luksch, petitioners do apparently on brief contend to the contrary of this fact. We recognize that ordinarily a cash basis taxpayer does not sustain a loss by merely substituting his note for a corporate note on which he is liable until such time as he has paid his note. However, in the instant case the agreement recites that Mr. Eason lent to Messrs. Pehlke and Luksch the $ 86,666 with *306 which to pay, as of February 19, 1971, the balance of the note which was not paid at that time in cash and for this loan each of them had executed a note to Mr. Eason for $ 43,333 payable in two installments due on February 20, 1972, and February 20, 1973. Because respondent has made no contention that this was not in fact a bona fide loan or borrowing of funds by Mr. Pehlke and Mr. Luksch from Mr. Eason on February 19, 1971, and a payment by them at that time to Mr. Eason in full of the $ 130,000 they recognized they owed to him as co-makers of the VTC note, and petitioners did not raise any issue with respect to this until brief, we accept the recitation in the agreement of February 19, 1971, as it is stated and consider no issue properly before us as to whether in fact Mr. Eason was not paid his full $ 130,000 by Mr. Pehlke and Mr. Luksch on February 19, 1971. This brings us to the most difficult of the factual issues which is the amount, if any, of loss each Mr. Pehlke and Mr. Luksch sustained in 1971 in connection with their agreement with Mr. Eason. Mr. Pehlke and Mr. Luksch, in return for the $ 65,000 each paid to Mr. Eason on February 19, 1971, each received 15,750 shares *307 of Texscan stock which they had not previously owned and in addition received a one-half interest in the "earnout" agreement between Texscan and VTC dated February 25, 1970. While it is not completely clear from this record that the value on February 19, 1971, of one-half of the "earnout" agreement was the $ 8,742.36 note for which each Mr. Pehlke and Mr. Luksch released his interest to Texscan on July 16, 1971, this release is the best evidence in the record as to the value of the earnout agreement and we accept it. The record shows that on February 19, 1971, and February 20, 1971, the bid price on the over-the-counter market of Texscan common stock was $ 4-1/4 and the asking price $ 4-1/2. Respondent contends that the $ 4-1/4 bid price of stock on the over-the-counter market on February 19, 1971, is the price that should be used in computing the value of the stock received by Messrs. Pehlke and Luksch and that therefore the value of this asset alone exceeds the $ 65,000 each paid to Mr. Eason. Petitioners contend that this stock was "legend" (restricted) stock and therefore did not have the value of unrestricted stock which might be sold on the over-the-counter market at $ *308 4-1/4 on February 19, 1971. Mr. Pehlke testified without objection by respondent that this stock was restricted and in fact this same fact is recited in the agreement between Mr. Eason and Messrs. Pehlke and Luksch dated February 19, 1971. The testimony in this case not only contains one statement by Mr. Pehlke in this respect but is replete with such statements. Mr. Pehlke testified that the stock received by him and Mr. Luksch under the agreement with Mr. Eason was "legend" stock and stated that he meant by this statement that the stock had a legend on the certificates stating that it is insider stock and restricted as to trading. He stated further that the stock was not registered with the Securities and Exchange Commissionor any state securities commission. He specifically stated that the stock which had been pledged by VTC as well as the stock pledged by him and Mr. Luksch in connection with the VTC loan was "legend" stock and that the 25,000 shares he and Mr. Luksch had pledged with Mr. Eason was also "legend" stock. He even went on to explain that it was difficult to have a bank accept "legend" stock as collateral since it was not as readily salable as non-legend stock. *309 He further pointed out that in 1971 Texscan had issued "legend" stock to Mr. Buckley and to Mr. Friedberger (a former attorney of Texscan) in payment of legal fees and pointed to the statement in the prospectus with respect to Mr. Buckley who was the only one of the two at the time of the prospectus connected with Texscan. Respondent's counsel at no time objected to the testimony given in this respect by Mr. Pehlke without the production of stock certificates to shw the legend contained thereon and in fact upon cross-examination of Mr. Pehlke did not challenge this testimony which he had given. In this state of the record we conclude that the 15,750 shares of stock received by each Mr. Pehlke and Mr. Luksch was restricted stock. Our conclusion that the stock received by Mr. Pehlke and Mr. Luksch was restricted stock does not, however, cause us to conclude that its value was only one-half of the value of unrestricted stock as petitioners contend. To support their contention that the value of the restricted stock was only one-half of the value of unrestricted stock, petitioners offered the testimony of a securities expert who stated as his opinion that restricted stock generally *310 sold at less than unrestricted stock and that in some cases there was a substantial difference. He pointed out that the owner of restricted stock who wishes to sell such stock has the alternatives of registering the stock himself, which is generally prohibitively expensive; asking the issuer of the stock to register the stock at the time of offering other registered stock, which he referred to as "piggybacking;" or disposing of the stock to a buyer who is willing to take it with the restrictions of the legend. He stated that perhaps a purchaser would be happy to hold for two years stock of a company that was doing very well and the prospects of which were bright, particularly if it was clear that the company would do substantially better over the next two years, and in such case the discount might be small. He stated that it might be difficult to sell the stock at all if the purchaser concluded from the record of the company that the company would not do well over the following two years. He testified that if stock is below average in quality, or is speculative, a higher discount is justified for the legend than is justified for higher quality stock. In fact, he stated the more *311 speculative the stock, the greater the discount. This expert then testified that he would estimate a discount of Texscan legend stock at between 40 and 50 percent of the bid price.
While petitioners' expert witness was well qualified as a securities analyst and had testified as an expert in a number of cases, we do not accept the opinion he gave in this case. He testified that he had not examined any financial statements of Texscan for any period prior to 1970 and was basing his opinion of the stock solely on reports from 1970 through 1974. He did not explain why he concluded from these reports that as of February 19, 1971, the prospects of Texscan were not bright. To the extent we might be justified in concluding that the actual performance of Texscan for two future years could be accurately predicted by a prospective buyer of its stock, the financial results of the company for 1972 and 1973 would indicate that its prospects as of February 1971 were bright. He also was not familiar with the stock involved in the instant case, the length of time it might have been held by VTC prior to its transfer to Messrs. Pehlke and Luksch, or the effects of this holding period on their right *312 to sell the stock. Mr. Pehlke had given some testimony with respect to what he stated to be the "fungibility" rule as it related to "legend" stock, but when petitioners' expert was asked what this so-called rule was he stated: I'm not sure I can give you a clear definition, but I've always understood that it's as attached to something -- some other stock or so. Because of the unfamiliarity of petitioners' expert witness with respect to the financial data of Texscan, as well as his unfamiliarity with the stock received by Messrs. Pehlke and Luksch, we do not accept his estimate of the value of the Texscan stock transferred to Messrs. Pehlke and Luksch on February 19, 1971. The record in this case leaves unexplained how Messrs. Pehlke and Luksch went about having transferred to them the stock which was registered in the name of VTC when they received it. How this transfer was made might well affect the marketability of the stock.
Respondent in his notice of deficiency used the value of $ 3 per share for the Texscan stock transferred by VTC to Mr. Pehlke and Mr. Luksch on June 29, 1970, at which time the bid price of unrestricted Texscan stock was $ 3-1/2 and the asking price *313 $ 3-7/8. Also, in 1971 when the "legend" stock was issued to Mr. Buckley in payment of his legal fee, it was issued at $ 3 a share. Mr. Pehlke testified that the stock issued to Mr. Buckley was "legend" stock. The record also shows that on January 8, 1971, Mr. Pehlke and Mr. Luksch each exercised an option to purchase 10,000 shares of Texscan stock at $ 3 a share. From Mr. Pehlke's testimony it is clear that this was "legend" stock. On the basis of this record we conclude that the value of the 15,750 shares of Texscan stock which Mr. Pehlke and Mr. Luksch each received in connection with their agreement of February 19, 1971, with Mr. Eason was $ 3 a share. We have reached this conclusion from an examination of all the evidence in the record including the numerous financial statements, the prospectus and other documentary evidence, as well as all the testimony. We therefore conclude that Mr. Pehlke and Mr. Luksch each received property of a value of $ 55,992.36 in return for the $ 65,000 they paid to Mr. Eason on February 19, 1971, as co-makers of the VTC note and therefore that each of them sustained a loss in connection with the VTC note of $ 9,007.64. 2. Merchants and *314 Peoples Bank Loans.
The second item on which Mr. Pehlke and Mr. Luksch each have sustained a loss is with respect to the Merchants and Peoples Bank loans. Here the facts with respect to Mr. Pehlke and Mr. Luksch differ somewhat. Also, it was with respect to these loans that respondent allowed to each Mr. Pehlke and Mr. Luksch a short-term capital loss in his notice of deficiency. The record shows that on March 5, 1969, Mr. Pehlke obtained a loan of $ 25,496.25 after deduction of prepaid interest from the Merchants National Bank and Trust Company of Indianapolis, Indiana, and lent this amount to VTC on May 6. Mr. Luksch agreed that he would repay Mr. Pehlke one-half of any payments Mr. Pehlke made on this loan which were not repaid to Mr. Pehlke by VTC.On May 15 Mr. Pehlke obtained a loan from Peoples Bank and Trust Company, Indianapolis, Indiana, in the principal amount of $ 5,028.60 and lent VTC $ 5,000 of this amount. Mr. Luksch was not involved in any way in this loan. The record further shows that of the $ 30,496.25 which Mr. Pehlke lent to VTC from the proceeds of the Merchants Bank loan and the Peoples Bank loan he was repaid a principal amount of $ 12,000 by Mr. *315 Luksch with respect to the Merchants Bank loan and $ 1,666.70 by VTC with respect to the Peoples Bank loan. Although no cash repayment was made to Mr. Pehlke by VTC with respect to the Merchants Bank loan, on June 29, 1970, VTC transferred to Mr. Pehlke 8,237 shares of Texscan common stock which it owned in repayment of the Merchants Bank loan. Therefore, of the $ 30,496.25 which Mr. Pehlke lent to VTC from these two loans he was reimbursed in cash by Mr. Luksch and by VTC a total amount of $ 13,666.70, leaving a net of $ 16,829.55 for which he was not reimbursed except through the transfer to him of the 8,237 shares of stock. In accordance with his agreement with Mr. Luksch under which Mr. Luksch paid him the $ 12,000, Mr. Pehlke transferred to Mr. Luksch 3,828 shares of the Texscan stock which he received from VTC on June 29, 1970. It is with respect to these loans that respondent allowed a short-term capital loss. However, the record shows that instead of repaying Mr. Pehlke the one-half of the principal amount of the $ 25,496.25 loan Mr. Luksch only repaid Mr. Pehlke $ 12,000 of the principal amount. Therefore the record substantiates the amount of $ 16,829.55 as the portion *316 of the loans made to VTC by Mr. Pehlke from the Merchants Bank and Peoples Bank loans for which he was not repaid in cash. There is nothing in this record to justify using any value other than the $ 3 per share used by the respondent to apply to the Texscan stock received from VTC by each Mr. Pehlke and Mr. Luksch in arriving at their net loss.Although the record shows that the bid price of unrestricted Texscan stock on June 29, 1970, was $ 3-1/2 a share and also shows that VTC in offsetting the loan apparently valued this stock at $ 3.213 per share, there is nothing to show that this would be the value of restricted stock. While the record is not as clear that this stock was restricted as it is with respect to the stock received by petitioners under the Eason agreement, there is testimony by Mr. Pehlke to the effect that all the stock he and Mr. Luksch received was restricted stock. It was in that connection that he referred to the "fungibility rule." In any event, in our view the record here totally fails to show that any value other than the$ 3 a share used by respondent is proper. Therefore, the $ 16,829.55 of the advances made by Mr. Pehlke which were repaid only through the *317 stock transfer should be reduced by $ 13,227 as respondent did in his deficiency notice, thus leaving a net loss to Mr. Pehlke of $ 3,602.55. Actually the loss sustained by Mr. Luksch properly should be $ 516 instead of the $ 1,680 determined by respondent. Respondent in fact on brief points out that he overallowed the amount of loss to Mr. Luksch with respect to this transaction. However, respondent made no claim that the loss he determined be reduced. So in the case of Mr. Luksch we conclude that the short-term capital loss with respect to this transaction of $ 1,680 as determined by respondent is properly allowable to Mr. Luksch. We do note that there is evidence in this record which would tend to indicate that the losses sustained by Mr. Luksch and Mr. Pehlke in connection with the Merchants Bank and Peoples Bank loan transactions were sustained in 1970 rather than in 1971.However, respondent has made no such contention and in fact, as petitioners point out with respect to the loss sustained on the VTC notespayable account where respondent in effect made such a contention, no such determination was made in the deficiency notice, no such allegation was made in the answer *318 or in an amended answer, and no such contention was made at the trial. It would be totally unfair to petitioners at this stage for us to consider such a contention. They were in no way alerted at the trial to defend against or offer evidence to contradict a claim that the debt of VTC to petitioners became worthless prior to 1971. See Nash v. Commissioner,31 T.C. 569, 574 (1958); Swope v. Commissioner,51 T.C. 442, 452 (1968). 3. VTC Notes Payable Account.
The third loss claimed by petitioners was in connection with their notes payable account on the books of VTC. Petitioners placed great reliance on the fact that each of them was issued promissory notes in the amount of $ 25,041.99 dated July 1, 1970. However, the fact that the notes were issued does not, standing alone, establish that the advances were made by petitioners to VTC or that a bona fide debt existed. Wolff v. Commissioner,26 B.T.A. 622, 625 (1932). Petitioners concede errors in the VTC notes payable account to Mr. Pehlke and Mr. Luksch. They concede errors in the credit entries which should represent advances from Mr. Pehlke and Mr. Luksch to VTC with *319 respect to a $ 33,333.34 entry in each account in October 1968, a $ 8,333.34 entry in each account in December 1968, and a $ 78,799 entry in each account in October 1969. They recognize these errors because there are no journal entries to support these entries. Petitioners claim that the following entries in each of these accounts represent actual advances made by each Mr. Pehlke and Mr. Luksch to VTC: Advances to VTC Date of Advance
Mr. Pehlke
Mr. Luksch
July 19, 1968
$ 11,930.00
$ 11,930.00
August 1968
11,930.00
11,930.00
August 27, 1968
55,962.40
55,962.40
February 4, 1969
8,333.34
8,333.33
March 13, 1969
1,766.93
1,766.93
Total
$ 89,922.67
$ 89,922.66
Clearly, the record as a whole supports the fact that advances were made by each Mr. Pehlke and Mr. Luksch of $ 11,930 on July 19, 1968 and August 1968. Not only are these items shown in journal entries as having been advanced, but also the record shows that Mr. Pehlke and Mr. Luksch each reported two capital gains of $ 11,930 on the sale of Texscan stock at about the time of the advances, accounting for a source of funds from which they could have made the advances. In spite of *320 petitioners' strong arguments to the contrary, in our view the record is clear that the entries under date of August 27, 1968, of $ 55,962.40 in each account did not represent a cash advance by either Mr. Pehlke or Mr. Luksch on that date even though a journal entry to this effect does appear in VTC's journal. This entry was made one day after the Pehlkes and the Luksches signed as co-makers VTC's loan for $ 240,000 from the Anthony Wayne Bank and the amount of each entry is approximately the value of the collateral pledged by each Mr. Pehlke and Mr. Luksch to guarantee that loan with the bank and to persuade Mr. Eason to put up his 5,000 shares of Bio-Dynamics, Inc. stock. If the 18,500 shares of Texscan stock is considered at a value of $ 3 a share, the amount of collateral placed by each Mr. Pehlke and Mr. Luksch with the Anthony Wayne Bank and with Mr. Eason would equal $ 55,500. When this fact is considered in conjunction with the fact that the October 1968 $ 33,333.34 admittedly incorrect entry in each account is at about the time of an increase in the loan from the Anthony Wayne Bank and other errors in the VTC account, the clear indication is that the $ 55,962.40 entries *321 did not represent cash advances. The record is replete with testimony by Mr. Pehlke and Mr. Luksch of their lack of funds with which to buy Texscan stock or make advances to VTC. Furthermore, they were unable in any way to account for the source of the funds for an advance of $ 55,962.40. On the basis of the record as a whole we conclude that the $ 55,962.40 credit in the account of each Mr. Pehlke and Mr. Luksch was an incorrect entry on the books of VTC. While it is not completely clear that the entry shown on the VTC notes payable account of each Mr. Pehlke and Mr. Luksch of $ 8,333.34 [6] on February 4, 1969, and $ 1,766.93 on March 13, 1969, represented actual cash advances, we have concluded, considering the journal entries showing such an advance, the April repayment to each Mr. Pehlke and Mr. Luksch of $ 8,333.34 [6] and the July repayment to Mr. Pehlke of $ 1,650 after a June repayment of $ 150 and the July repayment to Mr. Luksch of $ 1,500, that the record as a whole does not support the fact that these amounts were actually advanced by Mr. Pehlke and Mr. Luksch to VTC. This results in total advances made by each Mr. Pehlke and Mr. Luksch to VTC of $ 33,960.27.The records *322 of VTC show total repayments to Mr. Pehlke of $ 24,350.02 and to Mr. Luksch of $ 23,850.00. This leaves a total amount of $ 9,610.25 of advances by Mr. Pehlke and $ 10,110.27 by Mr. Luksch to VTC for which they were not repaid. As we heretofore pointed out, the record contains some indications that these advances became worthless in 1970 rather than in 1971. However, respondent did not question in his deficiency notice, in his answer or at the trial the year of the claimed worthlessness of any advances petitioners made to VTC for which they were not reimbursed. We do not therefore consider properly before us the issue of whether in fact the VTC advances became worthless in 1970 rather than 1971. Having concluded that petitioners did sustain losses with respect to their advances to VTC as above set forth, we must decide whether these losses were ordinary losses or were in fact nonbusiness bad debt losses which are treated for the tax purposes under section 166(d)(1) as short-term capital losses. [7] Section 166(d)(2) [8] defines a nonbusiness bad debt as a debt other than one created or acquired in connection with a trade *323 or business of a taxpayer or one the loss from the worthlessness of which is incurred in the taxpayer's trade or business. *324 Clearly, VTC's debts to petitioners were not connected with petitioners' trade or business as distinguished from that of the corporation unless, as petitioners contend, they co-signed the VTC note and made the advances in order to enable them to retain employment with VTC. Section 1.166-5(b)(2), Income Tax Regs., provides in part as follows: SEC. 1.166-5 Nonbusiness debts. * * *
(b) Nonbusiness debt defined. For purposes of section 166 and this section, a nonbusiness debt is any debt other than-- (1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade or business of the taxpayer at the time when the debt becomes worthless; or (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The Supreme Court in United States v. Generes,405 U.S. 93 (1972), held that the standard to be applied in determining whether a guarantee of a corporate loan or an advance to a corporation by a shareholder-employee is proximately related to the trade or business of the employee as distinguished from the corporation *325 is to be based on the dominant business motivation of the employee in giving the guarantee or making the advance. The Supreme Court made it clear that the selfserving statement of the employee-stockholder that the advances were made in order to maintain his corporate employment is not, standing alone, sufficient to show that his dominant motivation for making an advance was to maintain his corporate employment. The determination must be made from all the facts in the case. In the Generes case the Court recognized that an unrepaid advance made by a stockholder-employee through a dominant motivation of maintaining his employment might result in a business bad debt connected with the individual's trade or business of being an employee. However, the Court stressed that a statement by an employee that such was his dominant motivation should be carefully analyzed in light of all the facts of record. Upon such an analysis of the facts here we conclude that the dominant motivation of neither Mr. Pehlke nor Mr. Luksch was to maintain a salaried income from VTC but rather was to protect his investment in the corporation. Petitioners argue that because of the lawsuits brought against *326 them and Texscan by Telonic Industries and I-Tel, Inc. their reputations in the industry were harmed and therefore they were fearful that they could not obtain employment in their field. Mr. Pehlke further contended that because he had had surgery for an ulcer in April of 1967 in which a large portion of his stomach was removed he was not readily employable. Considering the educational background and the type of positions that Mr. Pehlke and Mr. Luksch each had held prior to the formation of Texscan, in our view the record does not support these contentions.However, under the particular facts of this case which show that Mr. Pehlke and Mr. Luksch were founders of Texscan and the primary contributors to the success of that company, it is unmistakably clear that at any time they left the employ of VTC they would be re-employed by Texscan. In fact, the record shows that they were effectively doing the management work at Texscan as employees of VTC and the prospectus filed by Texscan in 1971 in substance so states. Also, the fact that upon the demise of VTC both Mr. Pehlke and Mr. Luksch returned to the payroll of Texscan with higher salaries than they had received from VTC is a clear *327 indication that the employment was always available to them should VTC not prosper. Petitioners argue that Texscan did not have funds available to pay Mr. Pehlke and Mr. Luksch. However the record shows that the management fee paid by Texscan to VTC in the two-year period that VTC furnished management services to Texscan exceeded the salaries paid by VTC to Mr. Pehlke and Mr. Luksch. We recognize that Texscan obtained some services other than its management by Mr. Pehlke and Mr. Luksch for the fees paid to VTC, but clearly the payment was sufficient to pay adequate salaries to Mr. Pehlke and Mr. Luksch and also discharge the cost of the other necessary services for which the management fee was paid. We conclude on the basis of this record as a whole that the dominant motivation of neither Mr. Pehlke nor Mr. Luksch in co-signing VTC's loan and making advances to VTC was to maintain their positions as employees of VTC. [9] We therefore conclude that the entire losses sustained by Mr. Pehlke and Mr. Luksch in connection with the co-signing of VTC's loa and advances made to VTC must be treated under section 166(d) as nonbusiness bad debts and deductions for these losses allowed only *328 to the limited extent that short-term capital losses are allowable under section 1211(b). 4. Section 6651(a)(2) Addition to Tax of the Luksches.
The final issue is whether the Luksches have shown error on the part of respondent in determining an addition to their tax under section 6651(a)(2). Section 6651(a)(2) provides as follows: SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- * * *
(2) to pay the amount shown as tax on any return specified in paragraph (1) on or before the date prescribed for payment of such tax (determined with regard to any extension of time for payment), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount shown as tax on such return 0.5 percent of the amount of such tax if the *329 failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; * * * Since the return filed by the Luksches showed no tax due but rather that an overpayment of tax had been made, clearly they are not liable for an addition to tax under section 6651(a)(2). Petitioners argue that since this is the only section under which respondent determined an addition to tax they have shown error in respondent's determination. Respondent argues that even though the addition to tax was determined under section 6651(a)(2) the explanation given made it clear that the determination was made because the Luksches' income tax return for 1972 was not filed "or the amount of tax due paid" within the time prescribed by law. Petitioners point out that section 6651(a)(1) provides for the addition to tax for failure to timly file. Respondent, however, argues that the Luksches were not misled by his determination in that they alleged in their petition that any failure to file or to pay the amount due before the prescribed date was due to reasonable cause and not to willful neglect *330 and at the trial introduced evidence with respect to the reason for the late filing of their return. In this regard Mr. Luksch basically testified that Coopers and Lybrand had prepared his tax return for the year 1971 and in accordance with the custom of Coopers and Lubrand when they prepared a tax return for a client in a prior year, he received in January 1973 a form to fill in with respect to his 1972 tax liability to enable Coopers and Lybrand to prepare his return. He testified that within 2 or 3 weeks after receiving this form he returned it with the requested information to Coopers and Lybrand, but that he could not remember the exact date on which he had returned the information. The record shows that the Luksches gave to Mr. Meyer, who was the accountant of Coopers and Lybrand handling their return, a Power of Attorney authorizing him to apply for an extension of time within which to file their return. Under date of April 11, 1973, Mr. Meyer did apply for an automatic extension on Form 4868 which extended the time within which to file the return to June 15, 1973. No further request for an extension was filed. Mr. Luksch testified that he had understood from Mr. Meyer *331 that an extension of time "had been taken care of" and had relied on Mr. Meyer to send him the return to sign and file within the period of the extension. However, the return was not sent to Mr. Luksch until shortly after the June 15, 1973, extension date had expired. This is a difficult case, both as regards respondent's use of the wrong section under which he determined the addition to tax and petitioner's failure to personally determine whether in fact a proper extension had been obtained. In a number of cases we have refused to hold a taxpayer's reliance on an accountant to timely prepare a return to be reasonable cause for the late filing of the return. See Mauldin v. Commissioner,60 T.C. 749, 762 (1973), and cases there cited. However, in Mauldin, as well as in many other cases involving late filing of returns, the time between the due date of the return and the filing date is far greater than was the situation in the instant case. Had respondent's determination of addition to tax been clearly under section 6651(a)(1), which concerns late filing of the return, rather than under section 6651(a)(2), we would consider ourselves impelled to determine *332 whether the factual circumstances present in this case caused it to be distinguishable from the Mauldin case and similar cases. However, the only determination made by respondent in this case was an addition to tax under section 6651(a)(2). The fact that no tax was shown to be due in the return filed is reasonable cause for section 6651(a)(2) to be inapplicable. In fact, until certain issues were disposed of by agreement of the parties at the trial, the Luksches were contending in this case that they owed no additional tax for 1972. Considering the situation as a whole, we conclude that the Luksches have shown error in respondent's determination of an addition to tax under section 6651(a)(2). Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The three additional employees were a Mr. Shevlot, a Mr. Litterski and a Mr. Cox.↩
3. VTC was formerly named Versatek Texscan Corporation.↩
4. Although the record is not completely clear in this respect, it appears that Mr. Eason returned to each Mr. Pehlke and Mr. Luksch the 12,500 shares he held as collateral for the Bio-Dynamics, Inc. stock when the agreement of February 19, 1971, was entered into.↩
5. Although neither the Pehlkes nor the Luksches claimed any bad debt loss on account of their payments under the Eason agreement on their income tax returns for 1972 and 1973 or in their petition or at trial, on brief they claim a portion of these losses occurred in each of the years 1971, 1972 and 1973.↩
6. The entry for Mr. Luksch was actually $ 8,333.33.↩
7. Section 1211(b) provides with respect to the amount of capital losses allowable as deductions as follows: SEC. 1211. LIMITATION ON CAPITAL LOSSES. * * *
(b) Other Taxpayer.-- (1) In general.--In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) whichever of the following is smallest: (A) the taxable income for the taxable year, (B) $ 1,000, or (C) the sum of-- (i) the excess of the net short-term capital loss over the net long-term capital gain, and (ii) one-half of the excess of the net long-term capital loss over the net short-term capital gain. ↩
8. SEC. 166. BAD DEBTS. * * *
(d) Nonbusiness Debts.-- * * *
(2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
9. While we have discussed the primary evidence causing us to form this conclusion, we should also point out that in addition the record shows a total disproportion in the amount which Mr. Pehlke and Mr. Luksch each had at risk from advances to or co-signing notes of VTC and the amount of salaries they received from that company.↩